UNITED STATES BANKRUPTCY COURT

WESTERN DISTRICT OF WISCONSIN

---

In re:                                          Case Number: 13-10813-7

    STANLEY G. YERGES,

                Debtor.

---

    H. BROOKS AND COMPANY, LLC,

                Plaintiff,

                                    Adversary Number: 13-105

       v.

    STANLEY G. YERGES,

                Defendant.

---

## <u>DECISION</u>

On June 3, 2014, this adversary was tried to the Court on the issue of whether the Defendant possessed the requisite state of mind to commit "defalcation" within the meaning of 11 U.S.C. § 523(a)(4). The Court heard evidence and, at the conclusion of the trial, took the matter under advisement.

For the reasons that follow, the Court finds the Defendant did commit defalcation within the meaning of 11 U.S.C. § 523(a)(4), and, as a result, the Plaintiff's claim is determined to be nondischargeable under that provision of the Bankruptcy Code.

## JURISDICTION

The federal district courts have "original and exclusive jurisdiction" over all cases under title 11 ("Bankruptcy Code" or "Code") and "original but not exclusive jurisdiction" over all civil proceedings that arise under the Bankruptcy Code or that arise in or are related to cases under the Code. 28 U.S.C. §§ 1334(a)-(b). The district courts may, however, refer such cases to the bankruptcy judges within their district. In the Western District of Wisconsin, the district court has made such a reference. *See* Western District of Wisconsin Administrative Order 161 (July 12, 1984). Accordingly, this Court "may hear and determine all cases under title 11 and all core proceedings under title 11, or arising in a case under title 11 . . . and may enter appropriate orders and judgments, subject to review under section 158 of this title." 28 U.S.C. § 157(b)(1).

Bankruptcy courts determine whether a proceeding is core or non-core. 28 U.S.C. § 157(b)(3). Determinations as to the dischargeability of particular debts are core proceedings not constitutionally suspect under *Stern v. Marshall*, 131 S. Ct. 2594, 180 L. Ed. 2d 475 (2011). 28 U.S.C. § 157(b)(2)(I). This Court has both the jurisdiction and the authority to enter a final judgment in this matter. This decision constitutes the Court's findings of fact and conclusions of law.

## PROCEDURAL HISTORY

The Plaintiff, H. Brooks and Company, LLC, is a produce company headquartered in New Brighton, Minnesota. The Plaintiff is engaged in the business of selling perishable agricultural commodities to merchants, dealers, and retailers and holds a valid Perishable Agricultural Commodities Act ("PACA") license issued by the United States Department of Agriculture.

The Debtor/Defendant, Stanley G. Yerges, was the owner, operator, and sole shareholder of The Red Onion, LLC ("Red Onion"), a now-defunct grocery store in De Forest, Wisconsin. Red Onion held a valid PACA license and was subject to PACA as a commission merchant, dealer, and/or retailer.

The unpaid invoices at issue in this adversary relate to perishable agricultural commodities the Plaintiff sold to Red Onion between May 7, 2011, and September 7, 2011. On a weekly basis between May 18, 2011, and September 7, 2011, the Plaintiff forwarded, and Red Onion received, invoices for the shipments. Each invoice included the statutorily-required language preserving its PACA trust interests in inventory and sales proceeds pursuant to 7 U.S.C. § 499e(c)(4). Mr. Yerges received and reviewed these invoices. There was no objection to any of the invoices at any time prior to the Plaintiff's lawsuit. After taking into account all credits, the Plaintiff's outstanding invoices to Red Onion total $56,961.59.

The Plaintiff sued Red Onion and the Defendant in district court in the Western District of Wisconsin. On September 5, 2013, that court issued an

Opinion and Order granting the Plaintiff's motion for partial summary judgment. *H. Brooks & Co. v. Red Onion, LLC*, No. 12-cv-455-wmc, 2013 WL 4776503 (W.D. Wis. Sept. 5, 2013) (*"Brooks I"*). Relevant to the present adversary proceeding, *Brooks I* granted summary judgment in the Plaintiff's favor on its claim against Red Onion for violation of PACA. *Id.*, at *3. *Brooks I* conclusively determined that Red Onion had "(1) not paid any portion of the [balances on the outstanding invoices], (2) ceased operations as a going concern, (3) liquidated all of its inventory, and (4) paid the proceeds from the liquidation to its primary lender, the Small Business Association." *Id.*, at *1. In so finding, the court concluded Red Onion had violated its PACA trust obligations to the Plaintiff. *Id.*, at *3. *Brooks I* made no findings with respect to the Defendant individually and, evidently as a result of the Defendant's pending bankruptcy proceeding, dismissed the claims against the Defendant without prejudice. *Id.*, at *3.

The Defendant voluntarily filed bankruptcy under Chapter 7 on February 26, 2013. On June 7, 2013, the Plaintiff filed the pending adversary proceeding to except the PACA debt from discharge under 11 U.S.C. § 523(a)(4). The Defendant received a discharge on September 27, 2013, but the discharge order did "not affect any pending adversary proceeding to determine dischargeability."

The Defendant filed a motion to dismiss the adversary proceeding, which was denied on December 17, 2013. This Court found that it is undisputed the

4

Defendant was the sole person in control of The Red Onion. *H. Brooks & Co. v. Yerges (In re Yerges)*, Ch. 7 Case No. 13-10813-7, Adv. No. 13-105, 2013 WL 6665729, at *3 (Bankr. W.D. Wis. Dec. 17, 2013) ("*Brooks II*"). The Court also found that "[a]s such, the Defendant may be held personally liable for amounts owed to the [the Plaintiff] from the PACA trust assets and the failure to preserve or satisfy the obligations." *Id.* Finally, the Court concluded the PACA trust to which the Defendant was subject imposed fiduciary duties within the meaning of 11 U.S.C. § 523(a)(4).

After a period of discovery, the Plaintiff filed a motion for summary judgment, which was denied on May 6, 2014. The Court reiterated that PACA imposed fiduciary duties under section 523(a)(4), that those duties had been breached, and that the Defendant could face personal liability for breaching those duties. *H. Brooks & Co. v. Yerges (In re Yerges)*, Ch. 7 Case No. 13-10813-7, Adv. No. 13-105, 2014 WL 1803395, at *6-7 (Bankr. W.D. Wis. May 6, 2014) ("*Brooks III*"). However, there was a genuine issue of material fact concerning whether his conduct amounted to defalcation under section 523(a)(4), thus precluding summary judgment. *Id.*, at *7. In so finding, the Court expressly rejected the Plaintiff's position that any breach of fiduciary duties imposed by PACA constituted *per se* defalcation for purposes of section 523(a)(4). *Id.* Accordingly, summary judgment was denied. *Id.*

At the outset of the trial, the parties entered an oral stipulation that, in light of the decisions in *Brooks I, II,* and *III,* the only question for trial was

5

whether the Defendant's conduct satisfied the requirements for defalcation under the Code.

## FACTS

The Defendant spent the vast majority of his professional life in the grocery business, including twenty years of experience ordering produce from wholesalers like the Plaintiff. In 1974, he became an assistant manager at a Sentry Foods store. After a period of time, he moved to a store manager position in Fort Washington, Wisconsin, that he held for three to four years.

In the mid-1980s, the Defendant purchased his first grocery store in Chippewa Falls, Wisconsin. He acted as its manager, owner, and operator for two to two-and-a-half years. In that capacity he was involved in ordering inventory for the store, including produce from the Plaintiff. The evidence revealed that his involvement entailed placing purchase orders, taking delivery of the order, inspecting and inventorying the items that were delivered, and reviewing the accompanying invoices line-by-line.

After leaving the store in Chippewa Falls in the late 1980s, he took a position at Marketplace Foods in Rice Lake, Wisconsin, for four to five years. In that job he also ordered produce from the Plaintiff and reviewed invoices.

Next, he worked as a retail counselor at a Roundy's grocery store. In that capacity, he performed a wide variety of functions, including ordering produce, performing inventories of deliveries, and reviewing invoices.

He then moved to Portage, Wisconsin, to own and manage a Pick 'n Save grocery store. In this capacity, too, he ordered produce, performed inventories of deliveries, and reviewed invoices.

Finally, in March 2010, the Defendant opened the Red Onion in DeForest, Wisconsin. He was its sole owner, operator, and manager. The business model for the Red Onion contemplated a large portion of inventory would be perishables, including fruit and vegetables. The Plaintiff provided approximately ninety-five percent of the fresh produce to the Red Onion while the grocery store was in business. As in his previous roles, the Defendant himself would frequently place orders with the Plaintiff. He also inspected deliveries and reviewed the invoices line-by-line to confirm that the correct items had been delivered and billed.

After the Red Onion closed, the Defendant took a position that he continues to hold as a retail counselor with Great Lakes Foods, a grocery wholesaler. At present, he is consulting with ten different food stores. In his present capacity, he "assists with resets," and otherwise performs duties on an ad hoc basis depending on the needs of the particular store.

Virtually all of the stores for which the Defendant worked over the course of his career held PACA licenses. In addition, the Defendant was aware most of the wholesalers with whom he did business over the course of his career also held PACA licenses. The Defendant himself completed and signed the

application for the Red Onion's PACA license, and had done so at prior grocery
stores he owned as well.

Every page of every invoice sent by the Plaintiff to the Red Onion
contained required statutory language concerning PACA, and the Defendant
confirmed that he had read the language. The PACA language on the invoices
stated: "The perishable agricultural commodities listed on this invoice are
subject to the statutory trust authorized by section 5(c) of the Perishable
Commodities Act, 1930 (7 U.S.C. § 499e(c)). The seller of these commodities
retains a trust over these commodities, all inventories of food or other products
from these commodities, and any receivables or proceeds from the sale of these
commodities until full payment is received."

Despite having twenty years of experience as a PACA licensee doing
business with other PACA licensees, despite having applied for and received
PACA licenses on behalf of multiple stores, and despite reviewing all of the
invoices, the Defendant testified that he did not understand the purpose of
PACA while operating the Red Onion. The Defendant never investigated PACA
requirements and obligations.

The Red Onion operated at a loss from its inception. It fell behind on
payments to the Plaintiff early in 2010. It then became apparent the business
would not survive. When the Defendant was preparing to close the Red Onion
in October 2011, the Defendant negotiated directly with National Exchange
Bank ("NEB") to develop a liquidation plan. NEB held a security interest in

substantially all of the Red Onion assets. The liquidation plan that was agreed

to made reference to NEB's security interest in the Red Onion's assets, and it

specifically described a security interest in produce, meat, and other perishable

goods. The liquidation plan also instructed the Red Onion not to pay unsecured

creditors, including trade creditors like the Plaintiff. The Defendant did not

inform the Plaintiff or any other creditors about the liquidation plan because he

thought it was "not relevant" to them that all of the Red Onion's assets were

being surrendered to or liquidated for NEB.

The Defendant knew that by surrendering all of the Red Onion's assets to

NEB it was likely that no other creditors would receive payment. The decision

to enter into and abide by the liquidation plan was his alone.

When asked why he failed to inquire into his duties under PACA, the

Defendant pleaded ignorance and confusion. He explained that there was "a lot

going on," and that he owed "a lot of people a lot of money." He stated that if he

could do it over again, he would not have closed the store any differently, and

that he would turn over all assets to NEB. He explained that he felt that NEB,

as the "only one who had a lien against the business," was the only creditor

entitled to repayment.

The loans to the Red Onion were guaranteed by the Defendant. His

obligations to NEB were secured in part by mortgages on a house on Lake

Winnebago in which the Defendant owns a one-half interest. The mortgages to

NEB are in second and third position. Citibank holds the first mortgage, and

the Defendant's mother, Dorothy Arndt, holds a fourth mortgage. The mortgage
to Ms. Arndt secures a $153,691.48 personal loan to the Defendant.

The Defendant was aware at the time he agreed to the liquidation plan
that by surrendering all of the assets of the Red Onion to NEB, the consequent
reduction in the amount owed to NEB would benefit his mother's interest in the
home. He also was aware that any reduction in the debt to NEB would reduce
his personal liability. Finally, he knew that any payments to the Plaintiff or
other creditors from the Red Onion's assets would have reduced the amount
paid to NEB, which, in turn, would have left less potential equity for his
mother.

## STATEMENT OF LAW

The burden of proof in an action to determine the dischargeability of debt
is on the Plaintiff, who must carry the burden by a preponderance of the
evidence. *See, e.g.*, *Vorzella v. Basel-Johnson (In re Basel-Johnson)*, 366 B.R.
831, 844 (Bankr. N.D. Ill. 2007) (citing *Grogan v. Garner*, 498 U.S. 279, 291,
111 S. Ct. 654, 112 L. Ed. 2d 755 (1991); *Selfreliance Fed. Credit Union v.
Harasymiw (In re Harasymiw)*, 895 F.2d 1170, 1172 (7th Cir. 1990); *Banner Oil
Co. v. Bryson (In re Bryson)*, 187 B.R. 939, 961 (Bankr. N.D. Ill. 1995)). This
Court has previously held that to except a debt from discharge under section
523(a)(4), the statute requires that the Plaintiff demonstrate (1) the existence of
a fiduciary relationship between the parties at the time the debt was incurred,
and (2) that the debt was created by fraud or defalcation. *Brooks III*, at *3

10

(citing *Follett Higher Educ. Group, Inc. v. Berman (In re Berman)*, 629 F.3d 761, 765-66 (7th Cir. 2011)). This Court has already determined that the Plaintiff has established all but one element of section 523(a)(4). As such, the sole remaining question for decision is whether the Defendant's conduct amounted to "defalcation."

The term "defalcation" is treated similarly to "fraud" for purposes of section 523(a)(4). *Bullock v. BankChampaign, N.A.*, __ U.S. __, 133 S. Ct. 1754, 1759, 185 L. Ed. 2d 922 (2013). The Supreme Court ruled that defalcation "includes a culpable state of mind requirement akin to that which accompanies application of the other terms in the same statutory phrase. We describe that state of mind as one involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." *Id.* at 1757, 185 L. Ed. 2d 922. "Thus, where the conduct at issue does not involve bad faith, moral turpitude, or other immoral conduct, the term requires an intentional wrong." *Id.* at 1759, 185 L. Ed. 2d 922. This includes "not only conduct that the fiduciary knows is improper but also reckless conduct of the kind that the criminal law often treats as the equivalent." *Id.* at 1754, 185 L. Ed. 2d 922.

"Where actual knowledge of wrongdoing is lacking," conduct is considered equivalent "if the fiduciary 'consciously disregards' (or is willfully blind to) 'a substantial and unjustifiable risk' that his conduct will turn out to violate a fiduciary duty." *Id.* (citations omitted). "That risk 'must be of such a nature and degree that, considering the nature and purpose of the actor's

11

conduct and the circumstances known to him, its disregard involves a *gross deviation* from the standard of conduct that a law-abiding person would observe in the actor's situation.'" *Id.* at 1760, 185 L. Ed. 2d 922 (citations omitted) (emphasis in original); *Brooks III*, at *4.

Thus, under *Bullock*, the central question is whether the Defendant acted knowing that his conduct would violate his duties under PACA. *See, e.g.*, *Clear Sky Props. LLC v. Roussel (In re Roussel)*, 504 B.R. 510, 523 (E.D. Ark. 2013). In the absence of actual knowledge, the scienter requirement is satisfied if the Defendant consciously disregarded, or was willfully blind to, a substantial and unjustifiable risk that the conduct would breach a duty. *See id.* Such a risk is evaluated in light of the nature and purpose of the Defendant's conduct and the circumstances known to him. *See Fidelity Nat'l Title Ins. Co. v. Colson (In re Colson)*, Ch. 7 Case No. 09-51954-NPO, Adv. No. 10-05007, 2013 WL 5352638, at *29 (Bankr. S.D. Miss. Sept. 23, 2013). If, in view of those factors, he acted in gross deviation from the standard of care expected of a law-abiding person, *Bullock* is satisfied. *In re Roussel*, 504 B.R. at 523; *In re Colson*, 2013 WL 5352638, at *29.

## DISCUSSION

As is typical in such cases, there is no direct evidence the Defendant knowingly or intentionally violated his fiduciary duties under PACA. The Defendant denied an understanding of PACA requirements. At no time, however, did he make any effort to investigate the meaning, duties, or

12

requirements imposed by PACA. The testimony of the Defendant was

incredible. The Defendant acknowledged that most wholesalers with whom he

dealt had PACA licenses. While clearly proud of more than twenty years of

experience in the grocery business including managing and/or operating a

number of grocery stores, the Defendant feigned the belief that the only

purpose of PACA was to assure quality. Quality is never referenced in the

language of the invoices. Instead, it refers to the seller's trust on proceeds from

the sale "until full payment is received."

The Defendant was sophisticated enough to apply on multiple occasions

for PACA licenses for his businesses. He conceded that at one time he

understood the PACA language on the invoices. His insincere lack of

recollection of this at the time his focus was on an effort "to pay the Bank" was

a hollow attempt at verisimilitude.

There is more than ample evidence to suggest that the Defendant's

failure to even attempt to apprise himself of his fiduciary duties under PACA,

and, as a consequence, his failure to fulfill those duties, was a result of gross

recklessness. The main thrust of the Defendant's argument consisted of a

dubious and disingenuous plea of ignorance.

It strains credulity for the Defendant to suggest that despite spending

twenty years in the grocery business, during which time he not only engaged in

innumerable transactions with PACA licensees but also became a PACA

licensee himself (or arranged for entities he owned to become PACA licensees),

he never learned what PACA actually does or what it required of him. Neither were there ever any barriers that would have prevented the Defendant from informing himself of his PACA obligations.

To the contrary: even if, somehow, over the course of his career, the Defendant never once had a colleague or a business associate that was familiar with PACA with whom he consulted about PACA; even if, in the process of buying one of the multiple PACA-licensed grocery stores he owned throughout his career, he never bothered to inquire whether he was assuming any legal liability; and even if, somehow, in the course of applying for PACA licenses, he never ventured to determine for himself what the licenses were for, the evidence established that *every* invoice the Defendant received from the Plaintiff stated in clear terms that the items listed on the invoices were subject to a statutory trust pending receipt of full payment. *See, e.g.*, *Home Acres Bldg. Supply Co. v. Walsh (In re Walsh)*, Ch. 7 Case No. 1:13-CV-997, Adv No. 12-80108, 2014 WL 879495, at *3 (W.D. Mich. Mar. 5, 2014); *Parisi v. D'Urso (In re D'Urso)*, Ch. 7 Case No. 05-22274, Adv. No. 12-1685, 2013 WL 3286222, at *10 (Bankr. D.N.J. June 27, 2013). As if that were not enough to put the Defendant on inquiry notice, the PACA language on the invoices even gave a citation to the relevant section of the United States Code. He could have readily determined what, exactly, PACA required of him by any number of means short of hiring a lawyer, including an Internet search or a trip to the library. Instead, the Defendant pleads ignorance as an excuse. He focused solely on paying the

14

Bank. He suggests that because he says he did not know what the PACA trust provisions were, he should be excused from compliance. Despite the unambiguous language that appeared on every page of the dozens of invoices the Defendant received from the Plaintiff over many years of business, he argues that it was acceptable for him to fail to inquire and, as a result, he is exonerated from all responsibility.

The Defendant's other explanation for his ignorance—that he thought the purpose of PACA was to protect the quality of produce—is simply unbelievable in light of the language printed on the invoices. *See In re Walsh*, 2014 WL 879495, at *3; *In re D'Urso*, 2013 WL 3286222, at *10. Moreover, even if the Defendant's explanation was credible, it is axiomatic that ignorance of the law, whether the law is set forth in a statute or a duly promulgated regulation, is no defense. *See, e.g.*, *United States v. Int'l Minerals & Chemical Corp.*, 402 U.S. 558, 563, 91 S. Ct. 1697, 1701, 29 L. Ed. 2d 178 (1971). Defendant's demeanor contradicted his testimony and evidenced the lack of believability in his explanations for his ignorance of PACA requirements and the purported failure to undertake any investigation.

Finally, the closing of the store was a multi-variable problem: the Defendant testified that it involved resolving lingering payroll and tax issues as well as drawing up a liquidation plan with NEB. The Defendant testified he knew he owed "a lot of people a lot of money," and yet he never bothered to learn for sure whether the liquidation plan protected the rights of any creditor

15

other than NEB. He admitted he knew that under the liquidation plan he negotiated with NEB it was likely that none of his unsecured creditors would receive a dime, and yet he did not even bother to inform his creditors of the liquidation. He did, however, manage to have a provision included in his agreement with NEB that payroll would be paid.

The fact that he chose not to seek assistance to resolve a complicated legal and financial problem, and in the process violated his fiduciary duties, underscores the conclusion that his conduct was a gross deviation from the standard of care of a law-abiding person in the Defendant's situation. *Cf. Jantz v. Karch (In re Karch)*, 501 B.R. 403, 409 (Bankr. D. Colo. 2013). The Defendant consciously disregarded his duties under PACA by turning a blind eye to the clear PACA language on the invoices and, instead, focusing solely on ways to pay NEB. He deliberately acted in a manner that maximized NEB's recovery, reduced his personal guaranty, increased equity in property that would benefit his mother, and willfully disregarded the possibility that other creditors may have had a legitimate claim to a portion of the Red Onion's assets. His testimony to the contrary was simply not credible. In light of all of the facts and circumstances, the Court concludes that the Defendant's conduct amounted to defalcation under section 523(a)(4) as interpreted by *Bullock*.

**CONCLUSION**

For the foregoing reasons, the Defendant's debt to the Plaintiff is determined to be nondischargeable under 11 U.S.C. § 523(a)(4).

A separate order and judgment consistent with this decision will be entered.

Dated: July 2, 2014

BY THE COURT:

_____
Hon. Catherine J. Furay
U.S. Bankruptcy Judge